UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VIVO CAPITAL SURPLUS FUND VIII, L.P., ) <br> Plaintiff, ) <br> v. ) <br> 1GLOBE CAPITAL LLC and ) <br> JIAQIANG "CHIANG" LI, ) <br> Defendants. ) | Civil Action No. 25-10914-MJJ |

## MEMORANDUM OF DECISION

June 30, 2025

JOUN, D.J.

      This action arises from a long-running dispute involving control of Sinovac Biotech Ltd. ("Sinovac" or the "Company"), a Chinese biopharmaceutical company. Plaintiff Vivo Capital Surplus Fund VIII, L.P. ("Vivo") has moved for a preliminary injunction against Defendants 1Globe Capital LLC ("1Globe") and Jiaqiang "Chiang" Li ("Li," together with 1Globe, "Defendants") for alleged violations of Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d). [Doc. No. 5]. Vivo alleges that Defendants, in coordination with other shareholders including OrbiMed Advisors LLC and OrbiMed Capital LLC (collectively, "OrbiMed"), have formed a group to effect changes in Sinovac's governance and failed to disclose this as required under Section 13(d). Defendants dispute Vivo's standing and deny any current violations of disclosure obligations, further challenging the basis for injunctive relief on all four equitable prongs. For the reasons explained below, Plaintiff's Motion is GRANTED.

**I.   BACKGROUND**

    a. <u>**Background and 2016 Events**</u>

Sinovac is a Chinese biopharmaceutical company incorporated in Antigua and Barbuda ("Antigua") and based in Beijing, and its common shares are listed on the Nasdaq Stock Market. [Doc. No. 1 at ¶ 24]. 1Globe is a Delaware limited liability company with its principal place of business in Boston, MA and a research affiliate in Beijing, People's Republic of China ("PRC"), and is solely owned by Jiaqiang "Chiang" Li ("Li"), a citizen of PRC who resides in Cambridge, MA. [*Id.* at ¶¶ 8–9; *id.* at 19]. Section 13(d) of the Exchange Act requires any person, including a group, acquiring beneficial ownership of more than 5 percent of a corporation's common stock to disclose information relating to such ownership. [*Id.* at ¶ 3]; 15 U.S.C. § 78m(d)(1). Defendants are subject to Section 13(d) because they beneficially own approximately 25.8% of the outstanding common stock of Sinovac. [Doc. No. 1 at ¶ 3].

On May 5, 2013, 1Globe filed a Schedule 13G[1] disclosing beneficial ownership of 6.19% of Sinovac common stock. [*Id.* at 21]. The Schedule 13G was signed by a Canadian citizen and resident ("Relative 1"), who is related to Li, under the position of Managing Director of 1Globe. [*Id.*]. By 2016, 1Globe and Li had acquired more than 10% of Sinovac's shares. [*Id.*]. On April 5, 2016, 1Globe filed an amendment to its Schedule 13G disclosing that it held 16.44% of Sinovac common stock, and that the shares were held in 1Globe's account. [*Id.*]. On April 11, 2016, Li filed a Schedule 13G under the name Chiang Li Family, disclosing a 6.08% position in Sinovac, which Li held in an individual account. [*Id.*]. 1Globe and Li had voting and investment power over all the shares reported on separate Schedule 13G filings submitted by 1Globe and

---

[1] Under the Exchange Act, a filer is allowed to file a short-form statement on Schedule 13G instead of a Schedule 13D if the securities were not acquired with the purpose or effect of changing or influencing the control of the issuer. 17 C.F.R. § 240.13d-1.

Chiang Li Family, and as such, the cumulative 22.5% block of Sinovac stock was beneficially owned by both 1Globe and Li, making them ineligible to file a Schedule 13G as passive investors under Rule 13d-1(c).[2] [*Id.*].

In February 2016, Sinovac announced that it had received a proposal for its equity to be bought out for $6.18 per common share and the company to be taken private by a consortium ("Consortium A") led by Vivo Capital, which included, among others, Sinovac's directors at that time (the "former board"). [*Id.* at 22; Doc. No. 21 at 11]. Subsequently, Sinovac received a rival privatization offer at $7.00 per share from a second consortium ("Consortium B"), which included Sinobioway Biomedicine Co. Ltd., a minority shareholder in one of Sinovac's major operating subsidiaries. [*Id.*]. The former board rejected the superior offer, and, in 2017, announced their decision to sell the Company to Consortium A at $7.00 per share. [Doc. No. 21 at 11]. Consortium B increased its offer to $8.00 per share two days later. [*Id.*]. The former board did not disclose the superior offer for months, but notified Consortium B in late October 2017 that it would not recommend its proposal. [Doc. No. 1 at 22, n.3; Doc. No. 21 at 12].

As of April 30, 2016, another Canadian citizen and resident related to Li ("Relative 2") held approximately 0.7% of Sinovac's shares in a Canadian brokerage account, which Relative 1 had access to. [Doc. No. 1 at 22]. From May 2016 through January 2017, Relative 1 built an additional 4.2% on the Sinovac position to total 4.9%[3] in Relative 2's account. [*Id.*]. In doing so,

---

[2] *See* 17 C.F.R. § 240.13d-1(c)(1) ("A person who would otherwise be obligated . . . to file a statement on Schedule 13D (§ 240.13d–101) may, in lieu thereof, file with the Commission . . . a short-form statement on Schedule 13G (§ 240.13d–102). *Provided*, that the person: Has not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect . . . [and] [i]s not directly or indirectly the beneficial owner of 20 percent or more of the class.").

[3] The total 4.9% fell just below the 5% threshold that would have triggered an Exchange Act Section 13(d) filing ("Section 13D"). [Doc. No. 1 at 23].

Relative 1 used funds totaling $13 million which were provided by 1Globe and Li. [*Id.*]. During that period, Li transferred a large block of shares of another stock to Relative 2's account which were liquidated, and the proceeds were used to purchase Sinovac shares in Relative 2's account. [*Id.* at 22–23]. Neither 1Globe nor Li made filings disclosing the purchase of the above-mentioned shares or any shared beneficial ownership of the securities. [*Id.* at 23].

      b.  **2017 Events**

Relative 1 opened a Canadian brokerage account in his own name in late December 2016 and began purchasing Sinovac shares after receiving a $5 million wire transfer from 1Globe and Li in February 2017. [*Id.*]. The following month, Relative 1 used an additional $5 million acquired through wire transfer from 1Globe and Li to build a 3.5% position in Sinovac shares within the period of February to December 2017, which comprised approximately 90% of the total account value. [*Id.*]. 1Globe and Li directly or indirectly had or shared voting and investment power over the Sinovac shares in Relative 1's account, making them beneficial owners of the securities. [*Id.*]. 1Globe and Li did not disclose the purchase or shared beneficial ownership of these securities. [*Id.*]. By December 2017, 1Globe and Li had beneficial ownership of approximately 31% of Sinovac's shares, including the 4.99% position in Relative 1's account and the 3.5% position in Relative 2's account. [*Id.* at 23, n.4]. However, at the time, only the 22.5% position held in 1Globe and Li's accounts was disclosed and split into two separate disclosure forms, and did not include the relatives' accounts on either schedule. [*Id.* at 23].

On July 7, 2017, 1Globe converted its amended Schedule 13G, disclosing its 16.44% position in Sinovac, to a Schedule 13D. [*Id.*]. The purpose of this conversion was to disclose that 1Globe now held the shares with a "control purpose," to support Consortium B's proposal and to vote its shares in favor of the acquisition. [*Id.*]. The Schedule 13D did not disclose material

increases in 1Globe or Li's beneficial ownership, Item 4 plans or proposals that relate to the acquisition of additional shares or changing the management or governance of Sinovac, or any Item 6 contracts, arrangements, understandings or relationships regarding securities of Sinovac. [*Id.* at 24]. Li did not convert the Chiang Li Family Schedule 13G, which previously disclosed the 6.08% Sinovac position held in his individual account, to a Schedule 13D.[4] [*Id.*].

On December 29, 2017, Sinovac announced in a press release that it would hold its 2017 Annual General Meeting ("AGM") of Shareholders on February 6, 2018 in Beijing. [*Id.*]. At the meeting, there would be a vote to "approve the re-election" of Sinovac's current directors since there were no other nominees at that time. [*Id.*].

    c. **<u>2018 To Present Events</u>**

Following the announcement of the AGM, Consortium B worked with other Sinovac shareholders, including OrbiMed, who supported Consortium B's proposal, to produce four additional director candidates ("Alternative Slate") to be nominated to replace four of the five current members at the AGM, without prior notice. [*Id.* at ¶ 25; *id.* at 24]. Li had voiced his desire for 1Globe to be represented on Sinovac's board in a meeting between himself and Consortiums A and B in 2017, and in January 2018, another Canadian citizen and relative of Li and Relatives 1 and 2 ("Relative 3") was chosen as a director candidate on the Alternative Slate. [*Id.* at 24]. By at least January 22, 2018, 1Globe and Li decided to participate in an activist plan, obtain proxies for the Sinovac shares held in their accounts, and instruct their representatives to attend the AGM and vote their shares for the Alternative Slate. [*Id.*]. 1Globe named Relative 3 as its representative on its proxy and Li's individual account was represented by an employee of

---

[4] In the cease-and-desist proceedings, the SEC noted that Li had already disclosed a control purpose with respect to the position held in 1Globe's account since 1Globe converted to a Schedule 13D and declared control purpose, and Li is the sole owner of 1Globe and he beneficially owned both blocks of shares. [Doc. No. 1 at 24].

1Globe's Beijing affiliate. [*Id.*]. Relatives 2 and 3, whose stock positions and relations to Li were not publicly disclosed, employed proxy representatives that were unaffiliated with 1Globe and the relatives. [*Id.* at 25].

At the AGM on February 6, 2018, the Alternative Slate received the majority of votes. [Doc. No. 1 at 25]. In November 2018, the High Court of Hong Kong found that two 1Globe-affiliated individuals filed forged documents with the Hong Kong Companies Registry to change the directors of Sinovac's Hong Kong subsidiary. [Doc. No. 1 at ¶ 26]. In March 2020, a PRC regulator similarly found that 1Globe and its allies submitted forged documents in order to unlawfully change the directors of Sinovac's Beijing subsidiary. [*Id.*].

On March 5, 2018, however, Sinovac announced its own determination that the Alternative Slate had not been validly proposed under Antiguan law and that the former directors were re-elected by a majority of validly cast votes.[5] [*Id.* at 25]. 1Globe challenged Sinovac's determination in a lawsuit filed against Sinovac in Antigua on March 13, 2018. [*Id.*]. Sinovac then filed lawsuits in federal courts in Massachusetts and in Delaware's Court of Chancery against shareholders, including 1Globe. [Doc. No. 21 at 12]. 1Globe also filed a declaratory judgment action in the Antiguan High Court to adjudicate the result of the AGM directors' election. [*Id.*]. The U.S. courts voluntarily stayed their proceedings to allow for fundamental issues to be decided in Antigua. [*Id.*]. Following a trial and an appeal to the intermediate court, 1Globe appealed to the Privy Council of the United Kingdom. [*Id.*].

In the period January through May 2018, with the situation at Sinovac unresolved, Relative 1 continued to purchase Sinovac common stock in the amount of a 1.6% position, which

---

[5] The Defendants assert that the former directors refused to relinquish control of the company and continued to exercise de facto control, resulting in Sinovac announcing that the ballot proposed at the AGM was "invalid." [Doc. No. 21 at 12].

was substantially funded by 1Globe and Li in the amount of $6 million. [Doc. No. 1 at 25]. From August 2017 until after the shareholder vote had already been held, 1Globe and Li did not make any Sinovac-related disclosures until March 26, 2018 when 1Globe filed an amended Schedule 13D with respect to its disclosed 16.4% position.[6] [*Id.*].

Until the Privy Council issued judgment, the former directors remained in "de facto control" of the company, and attempted to take Sinovac private by means of an "Amalgamation Agreement," yet did not acquire the two-thirds majority vote to do so, so they entered into several transactions with Vivo and its affiliates. [Doc. No. 21 at 13–14]. First, in exchange for Vivo Capital LLC's ("Vivo Capital") promise to vote shares in favor of the former directors, they sold 5.9 million shares to Vivo Capital in a Private Investment in Public Equity ("PIPE") transaction at $7.35 per share and installed one of its principals, Shan Fu ("Mr. Fu"), as a purported extra Sinovac director. [*Id.* at 14]. Vivo Capital then purported to transfer its rights to several of its funds, including the Plaintiff Vivo, who owns shares from the purported PIPE transaction. [*Id.*]. In July 2018, Vivo and Vivo Capital filed a Schedule 13D and have not updated until recently. [*Id.* at 15].

In May 2020, the SEC determined that 1Globe, Li and Li's relatives "failed to disclose their full beneficial ownership of Sinovac stock…thereby depriving existing and potential shareholders of information necessary to make fully informed investment decisions." [Doc. No. 1 at ¶ 27]. The SEC ordered that the Defendants cease and desist from committing or causing any violations and any future violations of Sections 13(d), to which the Defendants consented to the

---

[6] The SEC determined that 1Globe's amended Schedule 13D made incomplete disclosure regarding 1Globe's actions in connection with the February 2018 AGM and their effort to replace four of Sinovac's five directors. [Doc. No. 1 at 25].

entry of. [*Id.*]. In December 2020, 1Globe filed an amended Schedule 13D, which addressed allegations in the SEC settlement. [Doc. No. 21 at 15–16].

On January 16, 2025, the Privy Council found that at the February 2018 AGM, the former directors ceased to hold office, and the Alternate Slate was duly elected and have since been the lawfully appointed directors of Sinovac. [*Id.* at 13]. Following this ruling, an activist bloc led by Defendants and OrbiMed took control of Sinovac's Board, installing their slate of new directors, excluding Mr. Fu, Vivo's board representative. [Doc. No. 1 at ¶¶ 30, 35]. Plaintiff alleges that Defendants and OrbiMed have taken additional steps to entrench their control of Sinovac and to disenfranchise minority shareholders, including Vivo, while providing very little disclosures about their plans and proposals. [*Id.* at ¶ 35].

On February 28, 2025, Sinovac issued a press release announcing its new Board, which includes OrbiMed's Partner and Senior Managing Director, Li's nephew, and Li himself as Chairman of the Board even though Li was not nominated at the AGM. [*Id.* at ¶ 36]. The press release further stated that Sinovac had initiated a process to determine which shares of Sinovac are validly issued and outstanding, which Plaintiff alleges was an opaque threat to cancel Vivo's and other investors' shares. [*Id.*]. On April 1, 2025, Sinovac issued another press release announcing that the new Board "decided to declare a special cash dividend of US$55.00 per common share" to the exclusion of certain minority shareholders, including Vivo. [*Id.* at ¶ 38; Doc. No. 21 at 15]. But for the exclusion, Plaintiff alleges that Vivo and other shareholders would be entitled to more than 600 million U.S. dollars in dividend. [Doc. No. 1 at ¶ 38]. Plaintiff alleges that Sinovac, under the new Board, has been resisting a formal shareholder demand for convening a shareholders' meeting and electing a different slate of Director nominees. [*Id.* at ¶ 39].

Vivo and its funds have filed multiple lawsuits against Sinovac and its new directors, including this action. [Doc. No. 21 at 15]. Sinovac, now under the management of the new directors, has sought a declaration in Antigua seeking formal recognition of the import of the Privy Council Judgment with respect to several purported transactions between the former directors and Vivo and its affiliates. [*Id.*]. On May 14, 2025, Vivo purchased 84 Common Shares at a price of $122.85 per share in a privately negotiated transaction. [*See* Vivo Capital VIII, LLC, Schedule 13D, at 5 (filed June 13, 2025)].[7]

## II. ANALYSIS

### a. **Standing**

Shareholders have standing to sue for violations of Section 13(d). *See GAF Corp. v. Milstein*, 453 F.2d 709, 719 n.21 (2d Cir. 1971); *Bender v. Jordan*, 439 F. Supp. 2d 139, 160 (D.D.C. 2006). There is standing where "a plaintiff claims that as a purchaser of securities he has been injured as the result of the violation by a defendant of the securities laws, then the plaintiff has stated a claim upon which relief may be granted . . . [i]t is asserting an injury involving its stock interest . . . flowing from the defendant's failure to disclose his interest in that very stock in contravention of law." *Grow Chem. Corp. v. Uran*, 316 F. Supp. 891, 892 (S.D.N.Y. 1970). Defendants argue that Plaintiff does not have standing to seek relief from a Section 13(d) violation because "the PIPE transaction pursuant to which [Plaintiff] purportedly obtained securities was void ab initio due to the Former Incumbent Directors' lack of authority." [Doc. No. 21 at 17]. Specifically, Defendants argue that the PIPE transaction is void because the Privy Council found that the former directors ceased being directors at the February 2018 AGM, and

---

[7] I take notice of the June 13, 2025 Form Schedule 13D provided to me by Defendants during the hearing held June 26, 2025. [Doc. No. 36]; *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 37 (D. Mass. 2002) ("This Court may take judicial notice of [an] SEC filing").

thus had no authority to approve the PIPE transaction or issue the PIPE shares. [*Id.*]. Defendants assert that the Antiguan High Court will determine the validity of the PIPE transaction and that because the PIPE shares are still in dispute, Plaintiff cannot rely on them for standing. [*Id.* at 18].

Plaintiff responds that the Privy Council did not make any finding that Vivo's *shares* are invalid, but rather, that the Council declined to invalidate the former board's actions despite 1Globe's request for such a declaration. [Doc. No. 26 at 6]. Plaintiff further argues that even if the PIPE shares were to invalidate its shareholder status, Vivo holds additional shares that did not issue in the PIPE, which confers standing. [*Id.*]. However, at the hearing held June 26, 2025, Defendants entered into the record a Form Schedule 13D indicating that Vivo did not purchase these additional shares until *after* Vivo filed its Complaint on April 14, 2025.[8]

Standing must be established at the time the complaint is filed. Article III mandates that "a plaintiff have a 'personal stake' at the outset of an action (standing) and throughout all stages of review (mootness)." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 909 (1st Cir. 2024). "For a plaintiff to have Article III standing, we determine whether it has asserted at the commencement of the litigation a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* at 909-910 (citing *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007)). "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (declining to find that later-added parties could "retroactively create[] redressability (and hence a jurisdiction) that did not exist at the outset")

---

[8] [Vivo Capital VIII, LLC, Schedule 13D, at 5 (filed June 13, 2025) ("On May 14, 2025, Vivo Capital Fund VIII, L.P. and Vivo Capital Surplus Fund VIII, L.P., two funds managed by Vivo Capital VIII, LLC purchased 608 and 84 Common Shares, respectively, at a price of $122.85 per share in a privately negotiated transaction")].

(citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)). According to these well-established principles, Vivo's purchase of 84 shares *after* filing its complaint would be insufficient to confer standing. As such, at this time, Vivo's 84 shares alone are insufficient to establish standing as a shareholder such that it can bring suit under Section 13(d).[9]

The inquiry, then, turns on whether the disputed shares Vivo acquired in the PIPE transaction are sufficient to confer standing. That dispute is subject to arbitration in Hong Kong and litigation in Antigua, but no court or tribunal has declared the PIPE shares invalid. I therefore evaluate standing on the present record. Vivo is listed as a registered shareholder of Sinovac and possesses physical share certificates. [*See* Doc. No. 7-1]. Under well-settled corporate law principles, that is *prima facie* evidence of shareholder status. *See Turnbull v. Payson*, 95 U.S. 418, 421 (1877).

In *Gill v. Regency Holdings, LLC*, 2023 WL 4607070, at *10-12 (Del. Ch. June 26, 2023), the court held that plaintiffs were entitled to proceed based on such records despite a pending challenge to the validity of their membership interests. The Chancery Court emphasized that absent clear and convincing evidence to the contrary, courts should not resolve disputed ownership claims in summary proceedings. *Id.* at *10. This principle applies with equal force here. Accordingly, Vivo's registered status and its subsequent share acquisition, if corrected through Rule 15(d), satisfy the standing requirement at this stage. I decline to elevate form over substance where Plaintiff clearly retains a current and ongoing financial interest in Sinovac.

---

[9] I note however that, under *Northstar Financial Advisors, Inc. v. Schwab Investments*, 779 F.3d 1036, 1043–44 (9th Cir. 2015), courts may permit a party to cure standing deficiencies through supplemental pleadings, including newly acquired interests. The First Circuit has similarly recognized that standing defects may be corrected via Rule 15(d). See *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 5 (1st Cir. 2015).

### b. **Preliminary Injunction**

A preliminary injunction requires the moving party to show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

I find that Vivo has demonstrated a substantial likelihood of success on the merits. Based on the record, and as detailed above, Defendants appear to have engaged in coordinated activities regarding Sinovac's governance while failing to file accurate and timely Schedule 13D disclosures. The allegations include omission of material facts concerning control relationships, beneficial ownership, and shared plans and arrangements with OrbiMed and others.

The harm resulting from incomplete disclosures is well recognized as irreparable. Shareholders are entitled to accurate and timely information to make informed voting and investment decisions. Courts have found similar disclosure deficiencies to warrant injunctive relief under analogous circumstances. *See Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 96 (1st Cir. 1977) (affirming district court's issuance of preliminary injunction requiring defendants to file accurate Schedule 13D because district court accurately found that defendants acted as a "group" within the meaning of Section 13(d)(3) and were required to file a Schedule 13D"); *Taseko Mines Ltd. v. Raging River Cap.*, 185 F. Supp. 3d 87, 93 (D.D.C. 2016) (granting preliminary injunction and finding likelihood of success on the merits where plaintiff "made a credible claim that Defendants did not fully and accurately disclose their [investment] purposes" under Section 13(d)). The timing of the alleged violations—preceding a potential shareholder meeting and board changes—further supports the urgency of relief.

The balance tips in favor of Vivo. Requiring Defendants to comply with existing legal obligations under Section 13(d) imposes minimal burden. Conversely, continued nondisclosure may irreparably harm minority shareholders and distort corporate governance. Additionally, enforcing federal securities law serves the public interest. *See Graphic Sciences, Inc. v. Int'lMogul Mines Ltd.*, 397 F.Supp. 112, 128 (D.D.C.1974) ("The Court concludes that the public interest demands uniform and exacting enforcement of the securities laws and that policy encourages a thorough review of possible violations thereof"); *Arcturus Therapeutics Ltd. v. Payne*, 2018 WL 2316790, at *9 (S.D. Cal. May 22, 2018) ("[A] fully informed shareholder vote in compliance with Section 13(d) of the Exchange Act is in the best interests of shareholders and the shareholding public in general").

Accurate and transparent disclosure is essential for fair and efficient markets. Contrary to Defendants' assertions, this relief does not intrude upon foreign sovereign authority and instead reinforces regulatory compliance across jurisdictions.

### III.    CONCLUSION

For the reasons stated above, Plaintiff's Motion for a preliminary injunction, [Doc. No. 5], is GRANTED to the extent that Defendants shall, within 5 days of this Order, file an amended and accurate Schedule 13D with the SEC disclosing their beneficial ownership interests, control relationships, group affiliations, and plans/proposals relating to Sinovac as required under 17 C.F.R. §§ 240.13d–101 and 240.13d–3. Defendants are ENJOINED from making further materially misleading statements regarding their shareholding or intentions with respect to Sinovac. All other aspects of the motion—including broader relief relating to governance outcomes or shareholder votes—are DENIED without prejudice pending further factual development.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge